**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 05-20595-CIV-UNGARO-BENAGES

CORPORATE FINANCIAL, INC., and
JOHN O'DAY
      Plaintiffs,

v.

PRINCIPAL LIFE INSURANCE CO.,
      Defendant/Counterplaintiffs,

v.

CORPORATE FINANCIAL, INC.
and JOHN O'DAY,
      Counterdefendants.
                              /

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment, filed March 10, 2006 (DE 114), and Plaintiffs' Motion for Partial Summary Judgment on Defendant's Counter Claims, filed March 10, 2006 (DE 122). Plaintiffs responded to Defendant's Motion for Summary Judgment on March 29, 2006, and Defendant replied on April 5, 2006. On March 27, 2006, Defendant responded to Plaintiffs' Motion for Partial Summary Judgment and Plaintiffs replied on April 3, 2006. These matters are now ripe for disposition.

THE COURT has considered the motions and the pertinent portions of the record and is otherwise fully advised in the premises.

## FACTS

Plaintiff Corporate Financial, Inc. ("CFI") is an insurance consulting and marketing organization incorporated in Florida with its principal place of business in Miami-Dade County. (Joint Pretrial Stip. Statement of Uncontested Facts ¶ 1, 4.) Plaintiff John O'Day formed CFI in

1993 and is its sole shareholder. (O'Day Dep. 17-18.)  Defendant Principal Life Insurance Co. ("Principal Life") is an Iowa stock insurance company that is licensed to conduct business and sell insurance products in Florida. (Joint Pretrial Stip. Statement of Uncontested Facts ¶ 2, 3.) Between September, 1993 and August, 2003, CFI placed Principal Life group insurance policies with CFI clients.

The parties' business relationship was governed principally by a series of Principal Life form contracts.[1]  Initially, in September 1993, O'Day, on behalf of CFI, executed Principal Life's Select Broker Contract and Broker Expense Allowance Agreement ("1993 Broker Agreement") (Compl. Ex. A; Principal Form # DD715) pursuant to which, *inter alia*, CFI was appointed a Principal Life broker.  This agreement provided in relevant part that it was terminable at will by either party upon written notice conforming to the requirements of the agreement and provided for the payment of some commissions subsequent to termination. (*Id*.) In January 2001, CFI and Principal Life entered into a Group Compensation Agreement (the "2001 Group Compensation Agreement"). (Compl. Ex. B; Principal Form # CA 351.) This agreement provided in relevant part for the payment of commissions on "premium received" on group policies in accordance with certain schedules "[w]hile this agreement is in force," and was terminable by Principal Life upon written notice.  The 2001 Group Compensation Agreement was amended several times (Joint Pretrial Stip. Statement of Uncontested Facts ¶ 13) and on or about April 29, 2003, Principal Life and CFI executed a new Group Compensation Agreement (the "2003 Group Compensation Agreement"). (Compl. Ex. E; Principal Form # 423.)  This agreement also

---

[1]  Apart from the contracts that governed their relationship generally, CFI periodically entered into commission agreements with Principal Life respecting individual group policies placed with CFI's clients.  (Joint Pretrial Stip. Statement of Uncontested Facts ¶ 6.)

2

provided in relevant part for the payment of commission on premium received for group policies in accordance with Principal Life's schedules "while this agreement is in force and subject to its provisions," but it was terminable at will by either party "at any time for any reason." Additionally, beginning in 2001, CFI and O'Day participated in Principal Life's Non-Medical Bonus Program for Brokers. (Pls.' Stmt. Facts Not in Dispute ¶ 7.)  In this program, brokers could earn production and persistency bonuses calculated in accordance with certain formulas for placing and maintaining group non-medical insurance business with Principal Life.  Principal Life's written materials describing the bonus program stated: "Final determination of the bonus amount and/or payment rests solely with Principal Life.  The bonus formula may change or terminate at any time without prior written notice." (Def.'s Ex. 89, 90, 91.)

Beginning in September or October of 2002, Michael Robinson, a Principal Life vice president, had discussions with O'Day regarding compensation strategies for placing Principal Life's products with large hospital clients, a sector in which commissions tend to be driven down by competition. (Robinson Dep. 20-23).  Robinson suggested the production and persistency bonus program as a vehicle by which O'Day could reduce his commissions in order to compete successfully for the large hospital business but still earn money on these clients. (*Id.*)   Robinson testified, "We reached a conclusion that Principal [Life] would waive the component of the bonus program that required a certain number of coverages each year, and that if we did that, John [O'Day] would then begin to reduce the commissions that he would charge to a client for a specific client or a specific line of coverage with a client." (*Id*. at 23: 10-16.)

On February 5, 2003, Robinson wrote a letter to O'Day at CFI "to provide clarification" on the issue of bonuses about which "[O'Day had] been in discussion with Dan Castrillon and

3

[Principal Life] over the past few months." (Pls.' Ex. 21; Robinson Letter 2/5/03.)  Robinson

wrote, "We are waiving the coverage count requirement in our bonus program for your block of

business.  This will put you in our bonus program immediately based on 2002 premium received.

This waiver is also valid for 2003." *Id*.  Then on April 14, 2003, Daniel Castrillon, Senior Sales

Representative for Principal Life, sent O'Day an email stating, "Per our conversation, we are

willing to offer you a 4% persistency bonus.  The bonus is contingent on premium requirements

being satisfied." (Def.'s Ex. 3; O'Day Dep. Ex. 197.)

Among the many clients with whom CFI placed Principal Life non-medical group

coverage were Stiefel Laboratories, Inc., Baptist Health South Florida, Mount Sinai Medical

Center of Greater Miami ("Mt. Sinai"), BayCare Health Systems of St. Petersburg ("BayCare")

and National Beverage Corporation ("National Beverage").[2]  These coverages were placed prior

to Robinson's February 5, 2003 letter: specifically, CFI placed Principal Life group coverage

with Stiefel Laboratories, Inc. and Baptist Health South Florida prior to 2002 (CFI Dep. 17-18,

62: 20-24); CFI placed Principal Life coverage with BayCare in 2001 effective January 1, 2002;

and CFI placed Principal Life coverage with National Beverage and Mt. Sinai in 2002 effective

January 1, 2003. (O'Day Dep. 361: 16-19; Reeder Dep.14: 18-25, 15: 1-11, 18: 16-18; Hatcher

Dep. 18: 9-12, 21: 19-25, 22: 1-5.)  Additionally, in 2001, CFI purchased Principal Life group

insurance for its own employees, effective in 2002. (Joint Pre-Trial Stip. Statement of

---

[2]  CFI has claimed in discovery that it was fraudulently induced by Robinson's and Castrillon's
representations concerning CFI's participation in the bonus program to place Principal Life
coverage with Mt. Sinai, Baycare, National Beverage, to obtain Principal Life group policies for s
for CFI's own employees, and to enter the 2003 Group Compensation Agreement  (CFI Dep.
106-107; Am. Compl. ¶¶ 41, 49.)  However, as explained, *infra*, the record is clear that these
placements pre-dated the February 5, 2003 letter from Robinson.

Uncontested Facts ¶9; CFI Dep. 18-19.)

Following a conversation with Castrillon about discrepancies in prior claims history for one of CFI's clients, Kim Little, Investigative Consultant for Principal Life, opened an investigation of O'Day and CFI. (Little Dep. 82-84.)  On August 25, 2003, by letter from Little, Principal Life terminated CFI's appointments and contracts without cause, effective 60 days thereafter. (Joint Pretrial Stip. Statement of Uncontested Facts ¶ 14; Compl. Ex. F.)

Then, on August 28, 2003, Little sent a letter to the State of Florida, Department of Insurance (the "Department") that Principal Life had decided to terminate CFI and O'Day's appointment[3] due to "company request." The letter informed the Department that "[I]t has come to our attention that...additional prior carrier claim information provided to us by Mr. O'Day was incorrect." (Little Dep. Ex. 64.)  The letter also explained that O'Day said that he did not alter the information and did not know who would have.  (*Id.*)  The letter concluded that "Since the prior carrier will not communicate further with us to confirm the accuracy of the information, we terminated Mr. O'Day's appointment due to 'company request' and provided 60 days notice as provided by Florida Law." (*Id.*)

Little wrote two subsequent letters to the Department.  The first letter, dated March 9, 2004, stated that it was "in response to our recent telephone conversation in which you asked for additional information concerning the earlier reported situation concerning John O'Day." (Pls.' Ex. 71.)  The March 9 letter offered information including the amount of commission received by O'Day for the Mt. Sinai policy, the difference in premium calculated by Principal Life between

---

[3]  "Appointment" is a defined term in Florida Statute 626.015(3) which means: the "authority given by an insurer or employer to a licensee to transact insurance or adjust claims on behalf of an insurer or employer." Fla. Stat. § 626.015(3).

the original quote and the reduced quote based on "altered information" provided by O'Day, and the amount of claims paid. (*Id*.)  The letter also stated, "The policy issued 1-1-03...was written with inappropriate Life Insurance rates due to inaccurate information given to us by Mr. O'Day." (*Id*.)  The second letter, dated September 28, 2004, began "In our recent telephone conversations concerning [O'Day], I mentioned to you that we had discovered an additional situation in which Mr. O'Day provided us with incorrect information, causing us to improperly rate an employer Life and Long Term Disability policy." (Pls.' Ex. 79.)  The letter then explained that information forwarded directly from BayCare for 2000 and 2001 did not match premium and claim totals for the same period provided by O'Day. (*Id*.)  The letter stated that there were discrepancies in documents and that names on documents from O'Day did not match names on documents from BayCare, and that there were significantly more claims on the BayCare documents. (*Id*.)  On January 5, 2005, the Department closed the investigation related to Mt. Sinai in a one page report which stated, "After reviewing the case and speaking with Ms. Kim Little, complainant at Principal Life Insurance, and Mr. Steven Fine, Vice President of Administration at Mt. Sinai Hospital, this case is being closed due to insufficient evidence and witness uncooperation. (Def.'s Ex. 114.)

Following the termination, Castrillon informed the policyholders that CFI was no longer authorized to service Principal Life products.  Castrillon contacted National Beverage and informed Don Hatcher that Principal Life was no longer doing business with O'Day and that it was required to assign another broker to the account. (Hatcher Dep. 42: 14-21.)  Hatcher testified that he pushed Dan Castrillon to tell him the reasons Principal Life was no longer doing business with O'Day: "I sort of pushed a little bit, you know. . . . He never really came out and told me.

He sort of–he said some words like, you know, we have doubts about John's–the information that we're getting from John and we believe that there's some misconduct on John's part.  And I said, well, I don't want to know any more." (*Id*. 43: 8-21.)  Hatcher also testified that Castrillon did not conclusively say that something dishonest was going on. (*Id*. 44: 12-25.)  Hatcher stated he informed his immediate supervisor of the innuendos relating to O'Day (*Id*. 72-23) and that he believed that National Beverage would have some hesitancy to do business with O'Day in the future (*Id*. 79-80).

On September 17, 2003, O'Day spoke to Ingrid Nilo at Mt. Sinai and she told him that Castrillon had told her that she needed to change the agent of record on the account. (O'Day Dep. 270: 21-25.)  O'Day, as corporate representative of CFI, further testified that a week before his deposition he spoke with Steve Fine, a representative of Mt. Sinai, who said that when he pressured Castrillon for an explanation for needing to remove CFI as agent of record, Castrillon replied "[b]ecause there's a problem with the claims history." (CFI Dep. 45: 8-17.)

Dan Castrillon called Barbara Wolf at BayCare and told her that she would need to pick a new agent and that John O'Day was no longer allowed to write business for them. (Barbara Wolf Dep. 34-35.)  Wolf asked Castrillon, "Why? What's going on?" and he said, "Barbara, that's between Corporate Financial and Principal, and let's just leave it at that at this point." (*Id*. 35: 8-12.)  Subsequently, on September 23, 2004, Principal Life had a meeting at BayCare.  Wolf testified that Principal Life representatives discussed discrepancies in the data but did not mention O'Day or CFI. (*Id*. 81: 7-15.)  Wolf stated, "I assumed that probably what they received from Corporate Financial and – was not the same data as what we had given them." (*Id*. 81-82.)  Additionally, she indicated that it was obvious that Principal Life was referring to the

7

discrepancies coming from CFI. (*Id*.)  At the meeting, Principal Life referenced among other written materials a September 22, 2003 letter from Eric Goyke, Senior Account Manager for Principal Life that stated: "We regret this premium adjustment is necessary however the increases we have proposed are no more than the premium levels we would have established had we received the correct experience data from your broker." (Pls.' Ex. 126.)

On October 6, 2003, O'Day sent Kim Little a letter titled "Re: Wrongful Termination of Contracts and Interference with Business Relations," (Compl. Ex. G; 10/6/03 Letter from O'Day.)  The letter began by representing that it was in response to Little's August 25, 2003 letter and further stated:

> It is our understanding per your letter, that our appointment with Principal has been terminated effective October 25, 2003.  Given your company's conduct, that is perfectly acceptable to us.  We will not be writing new business with Principal.  However, as Agent of Record and the producing agent, it is our contractual duty to continue servicing our clients until the contract period with Principal has expired.  It is our intention to do so and, when the contract period has expired, we will compete to retain the valued business of these clients.  These are extremely valued clients with whom we have worked many years to establish trust.  Principal's wrongful decision to terminate our contractual relationships does not justify its interference with our continued servicing of these clients.
>
> . . .
> We demand that you cease your interference, permit us to fulfill our contractual and fiduciary obligations to our clients and that you resume paying our commissions.

(*Id*.)

Notwithstanding the termination, CFI maintained its group insurance policies with Principal Life.  As of February 1, 2004, CFI was past due on a $238.28 premium payment. (Aff. Teresa S. Picthall ¶ 4, Ex. A.) Principal Life sent notices on March 4 and March 18, advising CFI of the past due amount. (*Id*. ¶¶ 4-7, Ex. A.)  Then on March 31, 2004, O'Day returned Principal Life's telephone call and informed Principal Life that it wanted to keep only its dental policy;

when advised that in order to make the changes, CFI would need to receive the past due amount, CFI elected to "leave it as is." (*Id*. ¶¶ 11-13, Ex. A.)  On April 5, 2004, Principal Life submitted the outstanding unpaid premium claim to Dunn & Bradstreet, a collection agency in accordance with its policies and procedures. (*Id*. ¶ 16.)

On January 19, 2005, CFI and John O'Day filed a three-count Complaint in state court, which was then removed to the Southern District of Florida.  In the Complaint, as later amended, CFI sues Principal Life for breach of contract (Count I) and fraud in the inducement (Count II), while CFI and O'Day sue Principal Life for defamation (Count III).[4]

On April 4, 2005, Principal Life filed a Counterclaim against CFI and O'Day alleging that they submitted inaccurate claim histories for Mt. Sinai and BayCare.  Principal Life alleges that its reliance on the inaccurate claims caused it to price the premium rates for Mt. Sinai and BayCare incorrectly and that Principal Life suffered substantial losses as a result.  Counts I and II of the Counterclaim allege fraud in the inducement against O'Day and CFI, respectively,  Counts III and IV are alternate claims for negligent misrepresentation against O'Day and CFI, respectively, and Counts V and VI are for breach of contract against O'Day and CFI, respectively.

## LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

[4] Defendant Cundy, Inc. was dismissed from this action on March 20, 2006 without prejudice, upon stipulation of the parties. (DE 149.)

that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  The

Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), that when

assessing whether the movant has met this burden, the court should view the evidence and all

factual inferences in the light most favorable to the party opposing the motion.

The party opposing the motion may not simply rest upon mere allegations or denials of

the pleadings; after the moving party has met its burden of coming forward with proof of the

absence of any genuine issue of material fact, the non-moving party must make a sufficient

showing to establish the existence of an essential element to that party's case, and on which that

party will bear the burden of proof at trial. *Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole*

*v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883

F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the court must not decide them; it must deny the

motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[5]

Summary judgment may be inappropriate even where the parties agree on the basic facts, but

disagree about the inferences that should be drawn from these facts.  *Lighting Fixture & Elec.*

*Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).  If reasonable minds might

differ on the inferences arising from undisputed facts then the court should deny summary

judgment.  *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d

1026, 1031 (5th Cir. 1982); *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable

---

[5]  Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

10

jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160.  The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967).  The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## ANALYSIS

I. *Principal Life's Motion for Summary Judgment*

As a preliminary matter, Principal Life argues in its Motion for Summary Judgment that Iowa law governs the breach of contract claim to the extent it is related to the 2003 Compensation Agreement, while Florida's substantive law controls the tort claims for fraud and defamation.  Neither CFI nor O'Day responded to this argument.  The Court agrees with Principal Life that it must apply Florida's conflict-of-law rules to determine which substantive law applies. *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1567 (11th Cir. 1990).  The parties agreed in the 2003 Group Compensation Agreement, "This is an Iowa contract and will be construed in accordance with the laws of the State of Iowa." Accordingly, Iowa law governs the breach of contract claim insofar as it arises under the 2003 Group Compensation Agreement. *See* Fla. Stat. § 671.105(1); *Mazzoni Farms, Inc. V. E.I. DuPont de Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000).   The balance of the contract claim, by contrast, is governed by the law of the

11

jurisdiction where the contract was executed, but the record is silent as to whether that occurred in Florida, or Iowa.[6] *See Sturiano v. Brooks*, 523 So. 2d 1126 (Fla. 1988). In any event, based on both Plaintiffs and Principal Life's arguments, it does not appear that Florida and Iowa contract law vary in any material degree affecting this case. (Def.'s Mot. 3.) The fraud and defamation claims are governed by Florida's substantive law, as the injury occurred in Florida and no other state has a more significant relationship to the occurrence and parties. *See Bishop v. Fla. Specialty Paint Co*., 389 So. 2d 999, 1001 (Fla. 1980).

A. *Breach of Contract*

CFI's breach of contract claim has four sub-parts as follows: (1) Principal Life wrongfully refused to continue paying CFI commissions on premiums collected from CFI clients after October 23, 2003; (2) Principal Life wrongfully required CFI's clients to appoint a new agent of record after it terminated CFI and tried to convince those clients to appoint Cundy, Inc. instead, (3) Principal Life wrongfully refused to permit CFI to service its clients through the expiration of their existing group policies and (4) Principal Life wrongfully refused to pay CFI production and persistency bonuses to which it was entitled.  Based on the parties arguments, the Court construes sub-part (1) to arise under the  2003 Group Compensation Agreement, sub-parts (2) and (3) arise under the 1993 Broker Agreement and the 2003 Group Compensation Agreement, and sub-part (4) to arise under the separate writing "Non-Medical Bonus Program for Brokers" as well as Robinson's letter dated February 5, 2003 and Castrillon's letter dated April 14, 2003.

(*i.*) *Commissions*

---

[6]  In the absence of any evidence presented by the parties that the contracts were executed somewhere other than Florida, the Court will apply Florida substantive law to the balance of the contract claim.

Principal Life argues that pursuant to the plain and unambiguous language of the commissions and termination provisions of the 2003 Group Compensation Agreement, it had the absolute right to terminate its relationship with CFI and O'Day, including any obligation to pay commissions upon written notice specifying the date of termination.  Thus, Principal Life contends that, as a matter of law, its obligation to pay commissions to CFI ended on or about October 26, 2003, pursuant to Kim Little's August 25, 2003 written notice of termination "60 days from the date of this letter."   On this basis, Principal Life contends summary judgment should be entered against CFI on this aspect of its breach of contract claim.

In response, CFI argues that the 2003 contract is susceptible to more than one construction regarding the obligation to pay commissions post-termination, rendering it ambiguous.  CFI focuses its argument on the following language that appears in the "commissions" section: "If the Policyholder tells Us in writing that You are no longer to act as Agent of Record, compensation will terminate."  CFI interprets this language and the termination provision to mean that while either party had the right to terminate the contract, the obligation to pay commission on any particular group policy persisted until a policyholder notified Principal Life in writing that it no longer wanted CFI to act as agent of record.  Additionally, CFI argues that, when considering the agreement as a whole, the portion of the agreement governing Principal Life's obligation to pay commissions is ambiguous and therefore, summary judgment is improper.

The question of whether an ambiguity exists in a written contract is a matter of law for the court. *See Hartig Drug Co. v. Hartig*, 602 N.W. 2d 794, 797 (Iowa 1999) (citing 17A Am.Jur.2d *Contracts* § 339, at 346 (1991)).  Ambiguity is not present simply because the parties

disagree on the meaning of a term; rather, genuine uncertainty exists when, applying the pertinent

rules of contract interpretation, a term is reasonably susceptible to more than one interpretation.

*Id*.

The language of the 2003 Group Compensation Agreement, in pertinent part, is as

follows:

> Commissions
> While this agreement is in force and subject to its provisions, We will pay commissions
> to You according to the following Commission Scales on Premium paid to Us each year
> for each Group Policy covered under this agreement.  We will pay compensation to You
> while You are recognized by the Group Policyholder and Us as Agent of Record and You
> provide service to the Policyholder in a manner satisfactory to Us.  Changes to this
> agreement must be by written notice and authorized by an Officer of the Company.  If the
> Policyholder tells Us in writing that You are no longer to act as Agent of Record,
> compensation will terminate.  We may, by written notice to You, change any or all of the
> rates paid under the commission schedules or provisions in this agreement.
>
> Termination
> We or You can terminate this agreement at any time for any reason.  Notice of
> termination must be in writing and specify the date of termination.  Notice will be
> effective on the earlier of mailing to the addressee's last known address or delivery to the
> addressee.
>
> We may terminate Your agreement without giving prior written notice if We reasonably
> believe that You have committed any fraudulent, dishonest or illegal act arising out of or
> related to this agreement or Our business or violated any provision of this agreement or
> Company policy, and the date of such termination will coincide with the date of the
> violation or act giving rise to termination.
>
> The agreement will terminate immediately in the event of expiration, cancellation or
> revocation of Your appointment with Us, or expiration, cancellation or revocation of
> Your license to sell insurance, or Your death.

(Compl. Ex. E; Principal Form # 423.)  The principles of contract interpretation demand that the

words and phrases used in the contract be given their commonly accepted and ordinary meaning.

*See Hartig*, 602 N.W. 2d at 797 (citing *Magina v. Bartlett*, 582 N.W. 2d 159, 163 (Iowa 1998).

Also,  the particular words and phrases must be considered in the context in which they were used. *Id*.  Furthermore, the Court must give meaning and effect to all the language of a contract.[7] *Fashion Fabrics of Iowa v. Retail Investors Corp.*, 266 N.W. 2d. 22, 26  (Iowa 1978).  No part should be assumed to be superfluous; an interpretation which gives a  "reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Id*.

In consideration of these principles, the Court finds that the 2003 Group Compensation Agreement is clear and unambiguous with respect to commissions due.  Giving the terms their ordinary meaning, the obligation to pay commissions exists "[w]hile this agreement is in force" and therefore ceases when the agreement terminated.

In reaching this conclusion, the undersigned has considered carefully CFI's contention that the Court should construe the 2003 agreement in light of the 2001 Group Compensation Agreement which had required commission payments through the first "compensation year" of the policy if the policyholder named another agent of record.[8]  CFI argues that Principal Life

---

[7]  The Court notes that while Plaintiffs have cited Florida law on contract interpretation, the principles of interpretation are consistent between Florida and Iowa law.

[8]  The 2001 Group Compensation Agreement stated, in pertinent part:
> While this agreement is in force and subject to its provisions, We will pay commissions to You according to the following schedules on Premium paid to Us each year for each Group Policy effective on or after the date of this agreement.  We will pay compensation to you while You are recognized by the Group Policyholder and Us as Agent of Record and You provide service to Policyholder in a manner satisfactory to Us.  If the Policyholder names another Agent of Record, this agreement will terminate after the completion of the First Compensation Year.

> This agreement and Your right to compensation will terminate upon written notice to You from Us or if Your license to sell insurance or Your appointment with Us is revoked, suspended or terminated.

altered this provision in 2003 to protect its agents' interest in the payment of commissions following termination by imposing the additional requirement that the policyholders advise Principal Life of their appointment of another agent of record in writing before compensation could terminate.

The Court finds that CFI's reading of the 2001 and 2003 Group Compensation Agreements does not conform to the applicable contract interpretation principles.  In order to accept CFI's interpretation, the Court would have to set aside the plain meaning of the first sentence of the commissions provision.  Reading the contract in its appropriate context, the only reasonable interpretation is that the first sentence establishes that as a condition to the obligation to pay commissions, the agreement must be "in force"; i.e. not terminated.  The following sentence of the commission provision establishes other conditions for the payment of commissions, namely recognition as the agent of record and satisfactory service to the policyholder.  That these sentences establish conditions for the payment of commissions is clearly indicated by the use of "while."

CFI's argument also completely fails to account for the fact that the 2003 Group Compensation Agreement governed the compensation arrangement for multiple group policies. CFI argues that the sentence "If the Policyholder tells Us in writing that You are no longer to act as Agent of Record, compensation will terminate" establishes the only way in which commissions would terminate. Yet, the only reasonable interpretation of that sentence is that it applied only when a particular client terminated its relationship with CFI; in that event, the 2003 Group Compensation Agreement otherwise would have remained in force until terminated in

_____

(Compl. Ex. B; Principal Form # 351.)

16

accordance with its terms.  Given that the parties intended the agreement to govern the sale of

multiple group policies, it is fitting that the agreement would provide for both the termination of

the overall relationship and the possibility that an individual client would appoint a substitute

agent of record.

The principles of contract interpretation require that every sentence be afforded a

meaning that does not deny meaning to the rest of the contract.  Accordingly, the commissions

and termination provisions of the 2003 Group Compensation Agreement are not reasonably

susceptible of Plaintiffs' interpretation and summary judgment is appropriate on the commissions

portion of the breach of contract claim.  The Court finds that, as a matter of law, Principal Life

had no obligation to pay commissions following its termination of the agreement pursuant to

Kim Little's August 25, 2003 letter.

(<em>ii.</em>)  <em>Servicing the Clients and Appointing New Agent</em>

Principal Life argues that pursuant to the parties' agreements, as well as Florida statutory

law, Principal Life had the right to terminate CFI's appointment following termination and that

absent an appointment, CFI was prohibited from servicing Principal Life's policyholders.

Principal Life further argues that nothing prohibited it from notifying policyholders that its

relationship with Plaintiffs had ceased and that they should secure a new agent of record to

service their Principal Life products.  Principal Life finds support for its arguments in Florida

Statutes §§ 626.112, 626.471.

As a preliminary matter, the Court notes that the parties agree that the 2003 Group

17

Compensation Agreement and the 1993 Broker Agreement were terminable at will.[9]  Following

Kim Little's letter of termination on August 23, 2003, O'Day responded, "It is our understanding

per your letter, that our appointment with [Principal Life] has been terminated effective October

25, 2003." (Compl. Ex. G.)

When used with respect to the insurance industry, an "appointment" is a defined term

meaning the authority given by an insurer to a licensee to transact insurance or adjust claims on

behalf of an insurer. Fla. Stat. § 626.015(3).  Pursuant to statute, "No agent or customer

representative shall solicit or otherwise transact as agent or customer representative, or represent

or hold himself or herself out to be an agent or customer representative as to, any kind or kinds of

insurance as to which he or she is not then licensed and appointed." Fla. Stat. § 626.112 (2).

Additionally, an insurer has the right to terminate its appointment of any appointee at any time

subject to an appointee's contract rights upon 60 days written notice. Fla. Stat. § 626.471(1).

The 2003 Group Compensation Agreement and the 1993 Broker Agreements were

terminable any time by written notice of either party.  Neither agreement makes special provision

with respect to the termination of appointments.  Principal Life thereby argues it had the right to

terminate CFI's appointments pursuant to the terms of its agreements and state law; and contends

it properly terminated its appointments of CFI and O'Day effective on or around October 26,

2003, following the written notice on August 25, 2003, from Kim Little.

In response, CFI argues that the 2003 Group Compensation Agreement gave it a right to

---

[9]  In Principal Life's Motion for Summary Judgment and Plaintiffs' Opposition, the parties do not dispute that the 2003 Group Compensation Agreement could be terminated without cause, but rather whether Principal Life was obligated to continue to pay commissions and to allow CFI to service the policies and otherwise act as agent of record following termination.

continue acting as agent of record and servicing Principal Life policyholders until the

policyholders informed Principal Life in writing that CFI was no longer to act as agent of record.

CFI further contends that Principal Life breached its obligation of good faith and fair dealing by

encouraging policyholders to change their agent of record.   However, CFI's argument wholesale

fails to take into account applicable Florida law.  "It is an accepted principle of law that when

parties contract upon a matter which is the subject of statutory regulation, the parties are

presumed to have entered into their agreement with reference to such statute, which becomes a

part of the contract, unless the contract discloses a contrary intention."  *Westside EKG Associates*

*v. Foundation Health*, 932 So. 2d 214 (Fla. 4th DCA 2005).  Applying this principle, since the

2003 Group Compensation agreement is silent with respect to termination of appointments,

Principal Life had the right pursuant to Fla. Stat. § 626.471(1) to terminate CFI's appointment on

60 days written notice.  The provision of the 2003 Group Compensation Agreement relating to

written notice of change of agent does not express an intention to opt-out of the statutory 60 day

notice rule of Fla. Stat. § 626.471(1); rather, as discussed in section (*i.*) *Commissions*, above, that

provision governed an individual policyholder's termination which left the relationship between

Principal Life and CFI intact.

Furthermore, there is no legal or factual basis for CFI's argument that Principal Life acted

in derogation of its good faith obligation.  When Principal Life terminated its relationship with

Plaintiffs, it did so indisputably according to the express terms of its contract allowing for

termination at will by either party.   The covenant of good faith  "cannot override an express

contractual provision." *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d

787, 791 (Fla. 2d DCA 2005).   Thus, it cannot be used to create a breach of contract where there

was no breach of any express term of the contract. *Avatar Development Corp. v. De Pani Construction, Inc.* 834 So. 2d 873, 876 (Fla. 4th DCA 2002) (holding that defendant's ulterior motive for termination had no relevance where contract permitted termination at any time). Therefore, as a matter of law, Principal Life did not breach the implied covenant of good faith.

Moreover, CFI and O'Day understood that their appointments with Principal Life to be terminated effective October 25, 2003. (Compl. Ex. G). Florida law is clear that a current appointment is a prerequisite for an agent to act as with respect to a policy. Fla. Stat. § 626.112(2). Accordingly, CFI had no right to continue acting as agent of record and servicing policies to which it did not have current appointments from Principal Life. Therefore, as a matter of law, Principal Life did not breach its contracts when it terminated Plaintiffs' appointments and notified its policyholders accordingly.

(*iii.*) *Bonuses*

CFI also seeks damages for failure to pay bonuses under the Non-Medical Bonus Program for Brokers. Principal Life argues that it is entitled to summary judgment on this claim because: (1) Principal Life retained discretion with respect to the amount and/or payment of any bonus due; (2) CFI did not meet the minimum required qualifications for the bonus program; and (3) Principal Life neither agreed to nor guaranteed that bonuses would be awarded or paid. As to the last of the listed arguments, Principal Life asserts that any communications regarding bonuses were merely negotiations, and that, at most, it agreed to waive the coverage count requirements for participation in the bonus program; in Principal Life's view, such waiver would have made CFI eligible for the bonus, but would not have created a right to the bonus because, pursuant to the language Principal Life used to describe the bonus program, the payment of bonuses was

20

discretionary.  Plaintiff relies on *Parrish v. General Motors Corp.*, 137 So.2d 255 (Fla. 2d DCA 1962) in which a Florida intermediate appellate court held that an employee did not have a vested right to a bonus which, under the company's bonus plan, was to be awarded at the company's discretion.

CFI responds that summary judgment is improper on the unpaid bonuses.  CFI argues that Principal Life's reliance on *Parrish v. General Motors Corp.*, 137 So. 2d 258 (Fla 2d DCA 1962), is misplaced because a reasonable fact finder could find from the record evidence, including the February 5, 2003 Robinson letter and the April 14, 2003 Castrillon letter that Principal Life and CFI reached agreement  entitling CFI to bonuses.

In *Parrish*, a General Motors employee claimed to have a vested right to a bonus under a bonus plan, which by its terms, gave a General Motors committee full discretion to determine any bonus award. *Parrish*, 137 So. 2d 255.  The district court of appeal held that the employee did not have a vested right to the bonus as a condition of his employment because under the plan the "employee is at all times charged with knowledge that a bonus award may be granted or withheld as to any employee at the discretion of the employer." *Id*. at 258.

Similar to the bonus plan in *Parrish*, Principal Life's bonus plan clearly contained language that gave it complete discretion in the awarding of bonuses: "Final determination of the bonus amount and/or payment rests solely with Principal Life." However, unlike *Parrish*, Principal Life arguably supplemented the terms of the bonus program in its correspondence with CFI.  Specifically, on February 5, 2003, Michael Robinson, on behalf of Principal Life, agreed to waive the coverage count requirement in their bonus program.  "This will put you in our bonus program immediately based on 2002 premium received.  This waiver is also valid for 2003."

21

(Pls.' Ex. 21; Robinson Letter 2/5/03.)  Then, on April 14, 2003, Castrillon sent CFI an email

that stated, "Per our conversation, we are willing to offer you a 4% persistency bonus.  The bonus

is contingent on premium requirements being satisfied." (Def.'s Ex. 3; O'Day Dep. Ex. 197.)

    Principal Life contends that it never agreed to pay CFI a bonus and that any

representations were mere negotiations.  Principal Life argues that as there was no meeting of the

minds as to essential terms, no agreement was reached relying on *Irby v. Memorial Healthcare*

*Group, Inc.*, 901 So. 2d 305, 306 (Fla. 1st DCA 2005).  However, in *Irby*, the district court of

appeal determined that a letter related to the sale of a private medical practice was merely an

agreement to make an agreement when that letter was missing key details necessary for such a

sale.  *Id*.  There can be no meeting of the minds between the parties when essential terms are left

open for consideration or negotiation.  *See, e.g. Glosser v. Vasquez*, 898 So. 2d 1179, 1181 (Fla.

3d DCA 2005); *Suggs v. Defranco's, Inc.*, 626 So. 2d 1100, 1100 (Fla. 1st DCA 1993) ("To be

enforceable, an agreement must be sufficiently specific, and reflect assent by the parties to all

essential terms. . . . Where essential terms of an agreement remain open, subject to future

negotiation, there can be no enforceable contract.")  In this case, the communications from

Robinson and Castrillon arguably contain the essential terms of an agreement to pay the

productivity and persistency bonuses.  In reaching this conclusion, the Court acknowledges that

Principal Life contends that Castrillon's email is not sufficient to offer a bonus because of the

phrases "willing to offer" and "contingent on premium requirements being satisfied."  However,

the Court is not persuaded by this argument.  "Willing to" before the word "offer" is not fatal

because the 4% term is sufficiently definite to constitute a promise.  Furthermore, the existence

of a condition does not render a contract unenforceable.

22

Therefore, although the bonus plan, as written, was discretionary, there is a question of fact as to whether Robinson's and Castrillon's correspondence reflect an agreement to exercise that discretion in CFI's favor with respect to the 2002 and 2003 bonus years.   Accordingly, summary judgment on the unpaid bonus portion of the breach of contract claim will be denied.

B. *Fraudulent Inducement*

The elements of a claim for fraud in the inducement in Florida are: (1) that the defendant misrepresented a material fact; (2) that the defendant knew or should have known that the statement was false; (3) that the defendant intended that the representation would induce the plaintiff to enter into a contract or business relation; and (4) that the plaintiff was injured by acting in justifiable reliance on the misrepresentation. *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1425 (S.D. Fla. 1996) (citing *Jankovich v. Bowen*, 844 F. Supp. 743, 747 (S.D. Fla. 1994)).

In the Amended Complaint, CFI alleges that it placed Principal Life policies in reliance upon representations that CFI would be entitled to productivity and persistency bonuses as described in the Non-Medical Bonus Program for Brokers circular attached as Exhibit "C."  In its Memorandum in Opposition to Principal's Summary Judgment at page 10, CFI identifies those misrepresentations as consisting of Robinson's February 5, 2003 letter in which Principal Life agreed to waive "the coverage count requirement in their bonus program for CFI's block of business, which puts CFI in the bonus program immediately based on the 2002 premium" and Castrillon's April 14, 2003 email confirming that Principal Life was willing to offer a 4% persistency bonus. [10]  CFI asserts that it reasonably relied on these apparently false

---

[10] Although Principal Life refers only to the "Group Compensation Agreements" in the wherefore clause of the fraudulent inducement claim, paragraph 43 alleges that Principal Life promised entitlement to bonus compensation to induce CFI to maintain its own group coverage policies

representations when it placed Principal Life products with its clients and that had it not relied on

the misrepresentations, it would have sold other insurance companies' products to its clients and

would have received commissions that it has not received since Principal Life terminated its

relationship with CFI.  CFI alleges it has been damaged because it has not received the

commissions it would have if CFI had sold insurance policies of alternative companies to its

clients.  (Pls.' Amended Complaint ¶¶ 42-49.)

Principal Life makes several arguments for dismissal of the fraudulent inducement claim,

but its principal argument appears to be that CFI cannot maintain an action for fraudulent

inducement because it cannot establish that it has suffered any injury in justifiable reliance on

any statements made by Principal Life with respect to bonuses.[11]  Principal Life argues that CFI

could not be justified in relying on any representations concerning bonuses when the subsequent

agreement did not contain any promises regarding bonuses.  Principal Life relies on *Barnes* for

this proposition. *See Barnes*, 932 F. Supp at 1428. ("It is a basic tenet of contract law that

reliance on representations by a contracting party in a suit based on the contract is unreasonable

where the representations are not contained in the subsequent written agreement between the

parties.")

---

with Principal Life and to sell Principal Life policies to CFI's clients. (Am. Comp. ¶ 43.)
Accordingly, Principal Life was on notice that the fraudulent inducement claim related to both
the 2003 Group Compensation Agreement and Non-Medical Bonus Program for Brokers. Fed. R.
Civ. P. 8(b); *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

[11]  Principal Life also argues the absence of proof of injury or damage to CFI from marketing
Principal Life products and in placing Principal Life products with CFI's clients, and that the
fraud in the inducement claim is barred by the economic loss doctrine.  The Court does not reach
these arguments because, as explained *infra* summary judgment is appropriate due to the absence
of proof of reliance.

In *Barnes*, the appellate court held that the plaintiff could not rely on prior representations that explicitly contradicted provisions of the subsequent agreement. *Id*.  Additionally, the agreement in *Barnes* contained an integration clause stating that the agreement "supersedes all prior negotiations, commitments, representations of the parties."  *Id*. at 424. *See also, Schubot v. McDonalds Corp*. 757 F. Supp.  1351 (S.D. Fla. 1990) (franchisee could not justifiably rely on oral representations not contained in the written franchise agreement where final integrated agreement contained release and disclaimer clauses.)  It is established law in Florida that a party cannot justifiably rely on representations not contained in a subsequent agreement when the agreement conflicts with those representations or where the party participated in drafting the agreement and did not reduce the representations to writing. *SEB S.A. v. Sunbeam Corp.*, 148 Fed. Appx. 774, 798 (11th Cir. 2005) (citing *Barnes,* 932 F. Supp. at 1428, and *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1315 (11th Cir. 1998)). However, it cannot be said that as a matter of law CFI could not have justifiably relied on representations made by Principal Life that are not contained in the 2003 Group Compensation Agreement because the representations regarding bonuses do not contradict the terms of the agreement, the agreement does not contain a merger clause, and there is no indication that CFI or O'Day participated in drafting the agreement. *See, Golden v. Mobil Oil Corp.*, 882 F.2d 490 (11th Cir. 1989).

That being said, there is another insurmountable legal obstacle to CFI's fraud in the inducement claim; and that is the absence of any record evidence that CFI took any action based on the alleged false representations that CFI has identified in its Memorandum. *See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290 (11th Cir. 1998) (affirming

district court's grant of summary judgment on lack of justifiable reliance); *see also Biscayne Boulevard Properties, Inc. v. Graham*, 65 So. 2d 858, 859 (Fla. 1953) and *Huffstetler v. Our Home Life Ins. Co*., 67 Fla. 324 (Fla. 1914).  While CFI refers to its placement of coverage with Mt. Sinai, and it even may be true that CFI lowered its commissions for the Mt. Sinai placement in anticipation of arriving at an agreement for a bonus, O'Day admitted that he placed the Mt. Sinai, BayCare and National Beverage coverages with Principal Life prior to the February 5, 2003, letter from Robinson. (O'Day Dep. 361: 16-18.)  The undisputed evidence also shows that the BayCare placement was completed prior to any representations regarding bonuses (Robinson Dep. 20: 11-23) and that CFI purchased Principal Life insurance policies for its own employees in 2002.  (Joint Pretrial Stip. Statement of Uncontested Facts ¶ 9.)  CFI has not identified any other clients with whom it placed Principal Life coverage after either the February 5, 2003 letter or its execution of the 2003 Group Compensation Agreement after its execution on April 29, 2003.  Accordingly, the Court will enter summary judgment against CFI on it fraudulent inducement claim.

C. *Defamation*

The Complaint alleges defamation based on (1) statements made by Kim Little to the Department regarding O'Day, (2) statements made by Dan Castrillon to induce policyholders to appoint a new agent of record following Principal Life's termination of O'Day, and (3) the filing of a collection claim against CFI with Dunn & Bradstreet.  Principal Life argues that it is entitled to summary judgment as to Plaintiffs' claim for defamation because many of the statement identified by Plaintiffs as defamatory were not false, and all allegedly defamatory statements by

Principal Life were protected by a qualified privilege and were not made with malice.  In

response, Plaintiffs contend that the statements were false and to the extent that qualified

privilege applies, that privilege is destroyed because Principal Life acted with express malice.

Under Florida law, the elements of defamation are as follows: Defendant (1) made a

statement, (2) that was false, (3) to a third party, i.e., Defendant "published the statement," and

(4) Plaintiff suffered damages as a result. *Carlson v. WPLG/TV-10, Post-Newsweek Stations of

Fla.*, 956 F. Supp. 994, 1005-06 (S.D. Fla. 1996) (citing *Shaw v. RJ Reynolds Tobacco Co.*, 818

F. Supp. 1539 (M.D. Fla.1993)).  Summary judgment is an appropriate vehicle for disposition of

a defamation claim and dismissal is appropriate when an element of the claim is not satisfied. *Id*.

Additionally, when statements are protected by a qualified privilege, a plaintiff has the burden of

establishing by a preponderance of the evidence that the statements were "false and uttered with

common law express malice–i.e., that the defendant's primary motive in making the statements

was the intent to injure the reputation of the plaintiff." *Fridovich v. Fridovich*, 598 So. 2d 65

(Fla. 1992) (citing *Nodar v. Galbreath*, 462 So. 2d 803, 806 (Fla. 1984)).

*(i.) Statements by Kim Little to the Department of Insurance*

Principal Life argues that the statements made by Kim Little in her letters to the

Department are not false and are protected by qualified immunity.  Principal Life contends that

Little sent the August 28, 2003, pursuant to Florida Statutes §§ 626.471 and 626.511.

Additionally, Principal Life argues that the March 9, 2004 and September 28, 2004, letters

responded directly to an administrative agency investigation and were, like her initial letter to the

Department, protected by a qualified privilege.  Principal Life argues further that Principal Life's

primary purpose for sending the initial August 28, 2003, letter was to comply with Florida Law requiring reporting of the reasons for the company request termination. (*See* Little Dep. 175: 2-15.)

Section 626.471 provides that an insurer may terminate its appointment of an appointee at any time, subject to an appointee's contract rights, and that in the event of termination of an appointment, within 30 days, the "entity shall file written notice...together with a statement that is has given the appointee [at least 60 days' advance written notice] and shall file...the reasons and facts involved in such termination as required under § 626.511." Fla. Stat. §626.471.  For its part, Section 626.511 states that an insurer "shall file with the department a statement of the reasons, if any, for  [termination of the appointment of an agent], and the facts relative to such termination." Fla. Stat. § 626.511.

The Court agrees with Principal Life that the letters from Kim Little are protected by the qualified privilege for statements made to an investigator that initiate an investigation. *See Fridovich v. Fridovich*, 598 So. 2d 65 (Fla. 1992).  Determining issues of privilege is a question of balancing "the right of the individual, on one hand to enjoy [a] reputation unimpaired by defamatory attacks, and, on the other hand, the necessity, in the public interest, of a free and full disclosure of facts in the conduct of the legislative, executive, and judicial departments of government." *Id*. at 68 (citation omitted.)  It is undisputed that Little's communications to the Department were in compliance with Florida law and in cooperation with a Department investigation.  When the circumstances surrounding the communication are undisputed, whether qualified privilege exists is properly decided by the court. *Nodar,* 462 So. 2d at 810.

Accordingly, Plaintiffs must rebut the privilege by a showing of express malice, meaning that they must show that Principal Life's primary motive was the intent to injure the reputation of the plaintiff.

Proof of express malice may be established indirectly, i.e., "by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive." *McCurdy v. Collis*, 508 So. 2d 380, 382 (Fla. 1st DCA 1987) (citing *Southern Bell Telephone & Telegraph Co. v. Roper*, 482 So. 2d 538, 539 (Fla. 3d DCA 1986).

Plaintiffs dispute the veracity of statements that O'Day provided incorrect claim information. (O'Day Dep. 99-100.)  Additionally, Plaintiffs advance the following theory of express malice which is supported by circumstantial evidence in the record:  Castrillon, Principal's own sales representative, provided the inaccurate claims information in order to facilitate the placement of coverage and earn commissions for his own account and then falsely blamed O'Day for the inaccuracies when the discrepancies came to light by, among other actions, altering documents to place responsibility on O'Day and/or destroying documents that would have exonerated O'Day. (Salem Aff. ¶ 11, 15-17; O'Day Dep. 251-55, Little Dep. 82-84, Castrillon Dep. 66, 88-89, 222-23.)  Additionally,  Plaintiffs argue that the statements were part of a broader scheme to harm O'Day financially and discredit him so that Principal would have justification for refusing to continue compensating CFI under the Group Compensation Agreement and the Non-Medical Bonus Program.

Principal Life argues that these theories does not establish express malice because even if provable, there is no evidence that Principal Life knew or should have known that the documents it relied on in its statements to the Department did not come from CFI.  Principal Life points to a fax containing CFI's fax registration line and other identifiers to illustrate this point. (Pls.' Dep. Ex. 33.)  Additionally, Principal Life argues that any scheme to justify termination is not supported by the record because Principal Life had the right to terminate CFI and O'Day without cause and did not have any contractual obligation to pay commissions after termination.  As discussed in the breach of contract section above, the Court agrees that the 2003 Group Compensation Agreement and any obligation by Principal Life to pay commissions under it could be terminated without cause.  This vitiates the second of Plaintiffs' express malice theories.  Nonetheless, as to Plaintiffs' first theory, Plaintiffs have produced sufficient circumstantial evidence consisting of the deposition testimony of O'Day, the affidavit of Ani Salem[12], a CFI employee, and Castrillon's own testimony regarding the disposal of documents (Castrillon Dep. 66, 88-89, 222-23) from which a reasonable jury could find that Castrillon was the source of the altered information, that he was motivated by an intent to injure Plaintiffs, and that his bad motive should be imputed to Principal Life.[13]  Accordingly, Principal Life's motion

---

[12]  Ani Salem represents that she mailed correct information for the BayCare account to Castrillon on June 10, that she had never seen certain documents that appeared to have been sent by fax from CFI, and that she did not make any alterations to documents.  (Salem Aff. ¶ 11, 15-17)

[13]  The Court notes that nothing in the record suggests that Kim Little herself was motivated by malice.  However, Principal Life has failed to address the legal significance, if any, of this fact. The Court has found at least one decision in which a district court determined that express malice could be imputed to a company when there was some evidence that an employee acted with

for summary judgment on the defamation claim based on Kim Little's communications to the

Department of Insurance will have to be denied.  *See, Randolph v. Beer*, 695 So. 2d 401, 404

(Fla. 5th DCA 1997) (reversing trial court's entry of judgment notwithstanding the verdict on the

issue of abuse of qualified privilege where a board member for a credit union reported a rumor of

a kickback scheme involving the plaintiff that he had heard from a third party but there was

evidence that the board member had animosity towards the plaintiff.)

(<em>ii.</em>) <em>Statements by Dan Castrillon to policyholders</em>

With respect to statements to policyholders, Plaintiffs claim that Principal Life made false

accusations to induce policyholders serviced by CFI to change their agent of record. Principal

Life argues that it had the right under the Group Compensation Agreement to terminate O'Day

and CFI's appointment and to discontinue recognizing CFI as the Agent of Record on Principal

Life Products.  Principal Life further argues that CFI's right to service Principal Life's

policyholders expressly terminated upon the termination of Plaintiffs' appointments.  Florida

Statutes §§ 626.431 and 626.381 support Principal Life's position.[14]  As previously discussed,

---

malice in filing a false report to company investigator who in turn included the statements in a
report on the reasons for plaintiff's subsequent termination to a regulatory agency. *Dickinson v.
Merrill Lynch, Pierce, Fenner & Smith Inc*., 431 F. Supp. 2d 247, 263 (D. Conn. 2006); *cf.
Schwaiger, M.D. v. Avera Queen of Peace Health Services*, 714 N.W.2d. 874 (S.D. 2006)
(finding no abuse of qualified privilege when company investigator included an arguably
malicious email from an employee alleging harassment by plaintiff in a subsequent letter to
plaintiff's employer).

[14] Section 626.431 provides: "Upon the expiration of any person's appointment, as provided in §
626.381, the person shall be without any authority conferred by the appointment and shall not
engage or attempt to engage in any activity requiring an appointment."  For its part, § 626.381
describes administrative procedures for renewal, continuation, reinstatement, or termination of

31

Principal Life had the ability to terminate the Group Compensation Agreement without cause.
Principal Life could also terminate Plaintiffs' appointment upon 60 days' written notice. Fla.
Stat. § 626.471.

Principal Life argues that statements made to its policyholders are protected by a qualified
privilege.  The common law recognizes as privileged "communications made for bona fide
commercial purposes where the interest to be protected is the recipient's" and "business matters
where both parties have a corresponding interest in the matter." *John Hancock Mutual Life Ins.
Co. v. Zalay*, 581 So. 2d 178, 179 (Fla. 2d DCA 1991).  Plaintiffs argue that qualified privilege
does not apply because the only interest Principal Life was seeking to protect was its own, and
not the policyholders'.  Additionally, Plaintiffs argue that qualified privilege does not apply
Principal Life was not responding to inquiries, but took the lead to tell Hatcher at National
Beverage and Wolf at BayCare that CFI had been terminated.  However, the Court finds upon
review of the record that the communications were clearly of the type contemplated by *Zalay*.
Policyholders have an interest in being informed about the termination of their agent of record,
particularly as Florida law prohibits a person who is not appointed by an insurer to "hold himself
out to be an agent, customer representative...as to, any kind or kinds of insurance as to which he
is not then...appointed." Fla. Stat. § 626.112.  Furthermore, the record establishes that during
communications with National Beverage and BayCare, the representatives for the policyholders
pushed for an explanation for the termination.  Therefore, the Court finds that Principal Life had

appointments.

32

a qualified privilege to make statements to its policyholders regarding Plaintiffs. *See Shaw v. R.J. Reynolds Tobacco Co.*, 818 F. Supp. 1539, 1542-43 (M.D. Fla. 1993) ("[C]ustomer had an interest in learning what happened to a sales representative with whom she had a longstanding personal and business relationship.")

Principal Life argues that Principal Life did not abuse its qualified privilege with respect to National Beverage because it only responded to direct inquiries, therefore its primary motive was to address the policyholders' inquiry and not to harm CFI and O'Day.  Additionally, Principal Life argues that Plaintiffs cannot show that it had a primary purpose to injure Plaintiffs when it informed BayCare in September 2004 that it wished to correct artificially low premiums it said resulted from CFI's inaccurate claims information.  However, as discussed above, based on O'Day's and Salem's testimony, a jury could reasonably find that Principal Life was responsible for the altered information and that it acted with malice.  Accordingly, summary judgment is inappropriate as to statements made by Castrillon to National Beverage and BayCare.

In contrast, the only evidence in the record with respect to statements made to Mt. Sinai is O'Day's deposition testimony regarding conversations between Castrillon, Ingrid Nilo and Steve Fine.  These allegations are incompetent evidence of publication, as they are hearsay. *See, e.g. Shaw*, 818 F. Supp. at 1542.  Inadmissible hearsay generally cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) To be considered on a motion for summary judgment an out-of-court statement made to the witness must be admissible at trial for "some purpose"; it must fall under a hearsay exception, not

constitute hearsay at all (because it is not offered to prove the truth of the matter asserted) or be used solely for impeachment purposes. *Id*.  Here, O'Day's deposition testimony regarding conversations between Castrillon and Mt. Sinai employees is rank hearsay.  Therefore, because Plaintiffs have not offered admissible evidence of defamatory statements to Mt. Sinai, Principal Life is entitled to summary judgment with respect to alleged statements to Mt. Sinai.

(*iii.*) *Statements to Dunn & Bradstreet*

Finally, Principal Life argues that it did not defame Plaintiffs by submitting a collection claim to Dunn & Bradstreet because the amount of the claim filed was undeniably due and owing, and Principal Life was within its right to file the claim.  Plaintiffs did not respond to this argument.  The only record statement regarding the basis for its defamation claim is, "[i]t was or right to go ahead and terminate the policy and Principal [Life] had no right to put us into collections."  (O'Day Dep. 366: 14-18.)  At best, this is nothing more than a scintilla of evidence and is insufficient to defeat summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986).  Plaintiffs have not made a sufficient showing such that a jury could reasonably find that the report to Dunn & Bradstreet contained false information.  Consequently, there is no genuine issue of fact for trial and Principal Life is entitled to summary judgment on the defamation claim with respect to the report to Dunn & Bradstreet.

II. *Plaintiffs' Motion for Partial Summary Judgment on Principal Life's Counterclaim*

Plaintiffs argue that they are entitled to summary judgment on all allegations relating to BayCare.  Specifically, Plaintiffs argue that there is no evidence that would prove that CFI altered or provided misinformation to Principal Life.  Plaintiffs rely on the affidavit of Ani

34

Salem, an employee for CFI, which states that she did not provide false information regarding BayCare's past claims history to Castrillon at Principal Life. (Salem Aff. ¶¶ 14, 16.)   Plaintiffs contend that there is no evidence or testimony that contradicts or discredits Salem's affidavit. Plaintiffs point, for example, to portions of the deposition testimony of Castrillon in which he said he had "no reason to doubt" that he received a June 10, 2002[15] package from Salem which states in its cover letter that a prior fax did not transmit correctly. (*See* Castrillon Dep. 104: 14-20; Salem Aff., Ex. D.)  Additionally, Plaintiffs argue that Principal Life cannot prove that the inaccurate information originated from CFI because Castrillon destroyed documents in his files in the Delray Beach Office after he sent the BayCare claims information to Principal Life's underwriters.

In response, Principal Life argues that Salem's affidavit cannot form the basis for summary judgment because it is controverted.  Castrillon testified he forwarded the BayCare information he received from CFI to Principal Life's underwriting department and that he never altered, deleted, changed, or otherwise tampered with documents he received from Corporate Financial. (Castrillon Dep. 31: 17-25, 32: 1-25, 33: 1, 17-25, 34: 1-8, 102: 16-24, 108: 2-22.) Castrillon also stated in his affidavit of March 24, 2005, that the BayCare documents Principal Life relied upon came from CFI through Principal Life's Delray Beach Office. (Castrillon 3/24/05 Aff. ¶ 51.)  Principal Life maintains that Plaintiffs' proffer of Salem's affidavit in which she swears she did not provide the fraudulent documents to Principal Life does little more than

---

[15] Although the cover letter states the date as "June 10, 2003," given the sequence of events, the year is clearly a scrivener's error. (Salem Aff., Ex. D.)

create a material question of fact concerning the sources of the inaccurate claims information

relied on by Principal Life.

Plaintiffs urge the Court to disregard Castrillon's affidavit on the basis of *Van T. Junkins*

*and Assoc., Inc. v. U.S. Industries, Inc., et al.* 736 F.2d 656, 658 ("When a party has given clear

answers to unambiguous questions which negate the existence of any genuine issue of material

fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts,

without explanation, previously given clear testimony.").[16]  However, Castrillon has been

consistent and unequivocal in his testimony that he forwarded all information received from CFI

to Principal Life's underwriters and that he never altered or deleted any information received.

His statements that he did not recall and had no reason to doubt he had received certain

documents from Salem do not contradict his clear testimony that he forwarded what he received

from CFI to the underwriters unchanged.

As the moving party, Plaintiffs must demonstrate that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law.  Furthermore,

the Court must, when assessing whether the movant has met this burden, view the evidence and

---

[16]  On April 13, 2006, Principal Life filed a Motion for Leave to file Daniel Castrillon's October
14, 2005, Affidavit.  Principal Life asserts that the affidavit is not in support of its opposition to
Plaintiffs' motion for partial summary judgment, but rather to establish that Castrillon's
testimony has been consistent.  Plaintiffs oppose the Motion for Leave to file the affidavit and
state that Principal Life has not shown good cause for failing to provide the affidavit earlier, and
that it is an attempt to serve an inappropriate sur-reply.  Because the Court finds that Castrillon's
deposition statements do not directly conflict with his March 24, 2006, affidavit, and in any
event, his deposition statements on their own demonstrate a genuine issue of material fact,
Principal Life's Motion for Leave to file the additional affidavit is denied as moot.

all factual inferences in the light most favorable to the party opposing the motion. Clearly there is a conflict between Castrillon's deposition which states he forwarded, unaltered, all information received from CFI, and Salem's affidavit swearing she provided accurate information to Principal Life.  Therefore, Plaintiffs' motion for partial summary judgment must be denied.  It is hereby

ORDERED AND ADJUDGED that Defendant Principal Life's Motion for Summary Judgment is DENIED IN PART and GRANTED IN PART.  It is further

ORDERED AND ADJUDGED that Plaintiffs Corporate Financial, Inc. and John O'Day's Motion for Partial Summary Judgment is DENIED.  It is further

ORDERED AND ADJUDGED that Principal Life's Motion for Leave to file Daniel Castrillon's October 14, 2005, Affidavit is DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of November, 2006.

_____
URSULA UNGARO-BENAGES
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record

37